IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 10-cv-00571-MSK

LARRY ALLEN THOMPSON,

    Petitioner,

v.

KEVIN MILYARD, Warden, Sterling Correctional Facility, and
JOHN SUTHERS, Attorney General of the State of Colorado,

    Respondents.

---

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

---

THIS MATTER comes before the Court on the Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 ("Petition") (#2) filed by *pro se* Petitioner Larry Allen Thompson. Respondents have filed an Answer (#26), and Petitioner has filed two documents, "Applicant's Response to Respondents' Answer" (#29-1) and a "Brief in Support of Applicant's Response" (#30), that collectively will be considered Petitioner's Reply to the Answer. After reviewing the record in this case including the Petition, the Answer, Petitioner's Reply, and the state court record, the Court **FINDS** and **CONCLUDES** that the Petition should be denied.

## I. Background

Petitioner is challenging the validity of his conviction in Denver District Court case number 93CR2979. Following a jury trial, Petitioner was convicted of first degree murder and sentenced to life in prison without the possibility of parole. The facts pertinent to Petitioner's conviction and his claims in this action are set forth in the decision of the Colorado Court of Appeals on Petitioner's postconviction appeal from the denial of his motion for a new trial.

In 1994, a jury convicted [Petitioner] of first degree murder for the killing of a drug dealer in Denver. The police found the victim's body on November 10, 1991. The victim had been stabbed over forty times, wrapped in a mattress cover, and dumped in a Denver alley. This murder was unsolved until 1993.

[Petitioner] lived in Portland with his wife in 1993, when she called the Portland police to tell them that [Petitioner] had abused her. She then told the police that [Petitioner] had confessed to her that he had murdered the victim. [Petitioner] was arrested, and he was brought to Colorado to stand trial.

Although [Petitioner] normally resided in Portland in 1991, he visited Denver at the time of the murder to care for his ailing mother. He stayed with his brother in the same apartment complex in which the victim lived. [Petitioner] and his brother regularly purchased crack cocaine from the victim, and the victim's girlfriend testified that animosity existed between [Petitioner] and the victim because of their drug dealing.

At trial, the jury heard from four witnesses who testified that [Petitioner] confessed to murdering the victim. [Petitioner's] wife testified that in 1992, while the two were living in Portland, [Petitioner] told her that he and his brother had become upset with the victim for selling them diluted crack cocaine and decided that the victim had "to die today." The brother held the victim down while [Petitioner] stabbed him. During this stabbing, the victim tried to free himself, resulting in [Petitioner] cutting himself on the wrist. [Petitioner], enraged by the cut, stabbed the victim "over and over." [Petitioner] and his brother "rolled the victim up in something," put the body in the brother's truck, and dumped him in an alley.

The jury also heard from three men from Portland to whom [Petitioner] made admissions. The first man, one of [Petitioner's] friends, testified that [Petitioner] said that he had stabbed a drug dealer in Denver, and then later asked the first man to keep that information confidential. The second man, who rented a room from [Petitioner's] wife, also testified that [Petitioner] had admitted murdering someone. The third man, another of [Petitioner's] friends, testified that [Petitioner] admitted that while he was in Denver, he had to kill the person who had cut him on the wrist.

> In addition to the testimony of these four witnesses, the jury also considered, as pertinent here, two other pieces of evidence. First, on November 10, 1991, [Petitioner] was treated at Denver General Hospital for a cut on his wrist consistent with a stab wound.
>
> Second, the jury heard about a carpet, seized after [Petitioner's] arrest in 1993, that was found in the truck in which [Petitioner] and his brother supposedly transported the victim's body to the site where it was discovered. A blood stain was found on the carpet that was analyzed by two different genetic methods. When combined, these yielded a result that excluded all but 4% of the relevant population as being possible sources of the blood. The victim fell within the 4% that was included as a possible source.
>
> [Petitioner] presented evidence indicating that the truck was being serviced in a shop at the time of the murder, and that the carpet had been installed in the truck after the murder. Therefore, he contended that the blood stain could not have come from the victim.
>
> He supported this theory with testimony indicating that another person had cut himself in the truck, after the carpet had been installed, and had bled on the carpet. The defense obtained a blood sample from the other person, and had it tested by only one of the same methods used by the prosecution. The result of this test, being less precise than the combination of tests used by the prosecution, only excluded 82% of the population as being possible sources of the blood, but it included both defendant [sic] and the other person as possible sources.

*People v. Thompson*, No. 06CA2270 (Colo. App. Sept. 10, 2009) (#13-3 at 3-6) (unpublished).

Petitioner's conviction was affirmed on direct appeal. *See People v. Thompson*, 950 P.2d 608

(Colo. App. 1997). On February 2, 1998, the Colorado Supreme Court denied Petitioner's

petition for writ of certiorari on direct appeal. (*See id.*)

Following his direct appeal, Petitioner wrote a letter to the trial court complaining that

trial counsel had been ineffective and requesting appointment of counsel to assist him in seeking

postconviction relief under Rule 35(c) of the Colorado Rules of Criminal Procedure. The trial

court denied Petitioner's request without a hearing, but the Colorado Court of Appeals reversed and remanded, concluding that Petitioner was entitled to appointment of counsel and an evidentiary hearing on the ineffective assistance of counsel claims. *See People v. Thompson*, No. 98CA1842 (Colo. App. Jan. 27, 2000) (#9 at 7-14) (unpublished).

> Before that evidentiary hearing took place, [Petitioner] conducted DNA testing on the stain from the carpet. This testing, which was more sophisticated and precise than the testing available at the time of trial, eliminated the victim as the source of the blood, and indicated there was a very high probability that the blood came from the other person. As a result of these improved tests, the prosecution stipulated, for the purposes of the postconviction hearing, that the blood stain on the carpet did not come from the victim.

(#13-3 at 7.)

Petitioner then filed motions for a new trial based on newly discovered evidence and for postconviction relief based on ineffective assistance of counsel. The trial court denied the motions on September 25, 2006. (*See* #2 at 32-33.) With respect to the motion for a new trial, the trial court concluded that a new trial was not warranted because Petitioner failed to establish "that the effect of the newly discovered evidence when considered with all other evidence in the case is such that a reasonable jury would probably conclude that a reasonable doubt existed concerning [Petitioner's] guilt and therefore would reach a not guilty verdict." (*Id*. at 33.) The Colorado Court of Appeals subsequently affirmed the trial court's order. (*See* #13-3.) On January 19, 2010, the Colorado Supreme Court denied Petitioner's petition for writ of certiorari in the postconviction proceedings.

The Petition was filed on March 11, 2010. Petitioner asserts the following three claims for relief:

      1.      His Sixth Amendment right to a fair trial by an impartial jury was violated because he was found guilty by a jury that had considered false blood stain evidence.

      2.      Counsel was ineffective by failing to conduct a reasonable pretrial investigation that included a comparison of the blood stain evidence with the blood sample obtained from a possible source other than the victim.

      3.      His Fourteenth Amendment right to a fair trial was violated by the use of false blood stain evidence to obtain his conviction.

Respondents concede that the application is timely and that Petitioner's claims are exhausted.

## II. Legal Standards

The Court must construe the Petition and other papers filed by Petitioner liberally because he is not represented by an attorney. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). However, the Court should not be an advocate for a *pro se* litigant. *See Hall*, 935 F.2d at 1110. For the reasons stated below, the Court will dismiss the action.

Title 28 U.S.C. § 2254(d) provides that a writ of habeas corpus may not be issued with respect to any claim that was adjudicated on the merits in state court unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Petitioner bears the burden of proof under § 2254(d). *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam).

A claim may be adjudicated on the merits in state court even in the absence of a statement of reasons by the state court for rejecting the claim. *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011). In particular, "determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning." *Id*. at 784. Furthermore, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id*. at 784-85. Even "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Id*. at 784. In other words, the Court "owe[s] deference to the state court's *result*, even if its reasoning is not expressly stated." *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999). Therefore, the Court "must uphold the state court's summary decision unless [the Court's] independent review of the record and pertinent federal law persuades [the Court] that its result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented." *Id*. at 1178. "[T]his 'independent review' should be distinguished from a full de novo review of the petitioner's claims." *Id*.

The Court reviews claims of legal error and mixed questions of law and fact pursuant to 28 U.S.C. § 2254(d)(1). *See Cook v. McKune*, 323 F.3d 825, 830 (10th Cir. 2003). The threshold question the Court must answer under § 2254(d)(1) is whether Petitioner seeks to apply a rule of law that was clearly established by the Supreme Court at the time his conviction became final. *See Williams v. Taylor*, 529 U.S. 362, 390 (2000). Clearly established federal law "refers to the

holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id*. at 412.  Furthermore,

> clearly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*. Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context.

*House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008).

If there is no clearly established federal law, that is the end of the Court's inquiry pursuant to § 2254(d)(1). *See id*. at 1018. If a clearly established rule of federal law is implicated, the Court must determine whether the state court's decision was contrary to or an unreasonable application of that clearly established rule of federal law. *See Williams*, 529 U.S. at 404-05.

> A state-court decision is contrary to clearly established federal law if: (a) "the state court applies a rule that contradicts the governing law set forth in Supreme Court cases"; or (b) "the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from [that] precedent." *Maynard* [*v. Boone*], 468 F.3d [665,] 669 [(10th Cir. 2006)] (internal quotation marks and brackets omitted) (quoting *Williams*, 529 U.S. at 405). "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" *Williams*, 529 U.S. at 405 (citation omitted).
>
> A state court decision involves an unreasonable application of clearly established federal law when it identifies the correct governing legal rule from Supreme Court cases, but unreasonably applies it to the facts. *Id*. at 407-08. Additionally, we have recognized that an unreasonable application may occur if the state court either unreasonably extends, or unreasonably refuses to extend, a legal principle from Supreme Court precedent to a new context where it should apply.

*House*, 527 F.3d at 1018.

The Court's inquiry pursuant to the "unreasonable application" clause is an objective inquiry. *See Williams*, 529 U.S. at 409-10. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be unreasonable." *Id*. at 411. "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Maynard*, 468 F.3d at 671. Furthermore,

> [E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. [I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.

*Richter*, 131 S. Ct. at 786 (internal quotation marks omitted). In conducting this analysis, the Court "must determine what arguments or theories supported or . . . could have supported[] the state court's decision" and then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id*. In addition, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

Under this standard, "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Maynard*, 468 F.3d at 671; *see also Richter*, 131 S. Ct. at 786 (stating that "even a strong case for relief does not mean the state court's contrary

conclusion was unreasonable").

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 131 S. Ct. 786-87.

The Court reviews claims asserting factual errors pursuant to 28 U.S.C. §2254(d)(2). *See Romano v. Gibson*, 278 F.3d 1145, 1154 n.4 (10th Cir. 2002). Section 2254(d)(2) allows the Court to grant a writ of habeas corpus only if the relevant state court decision was based on an unreasonable determination of the facts in light of the evidence presented to the state court. Pursuant to § 2254(e)(1), the Court must presume that the state court's factual determinations are correct and Petitioner bears the burden of rebutting the presumption by clear and convincing evidence. "The standard is demanding but not insatiable . . . [because] '[d]eference does not by definition preclude relief.'" *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

If a claim was not adjudicated on the merits in state court, and if the claim also is not procedurally barred, the Court must review the claim *de novo* and the deferential standards of § 2254(d) do not apply. *See Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004).

### III. Analysis

#### A.  Claims One and Three

Petitioner's first and third claims are similar and will be addressed together.  Both claims arise out of the fact that post conviction DNA testing demonstrated that the victim's blood was not that found on the carpet of the vehicle that the prosecution alleged had been used to transport the victim's body.  Petitioner asserts in his first claim that his Sixth Amendment right to a fair trial by an impartial jury was violated because the jury that found him guilty had considered false blood stain evidence.  He asserts in his third claim that his Fourteenth Amendment right to a fair trial was violated by the use of false blood stain evidence to obtain his conviction.

First, the Court pauses with regard to the reference "false evidence".  The Petitioner uses this term to describe the DNA evidence presented at his trial.  Although the state trial court used similar terminology, it is not accurate.  The Petitioner does not contend that the prosecution knowingly presented false evidence at his trial; he objects to the inference that the prosecution drew from the evidence that was presented and that post conviction DNA evidence disproved such inference.  As explained below, the originally admitted DNA evidence was not false or even inaccurate; it simply was not as precise as the DNA testing obtained post conviction.

According to the state court record, at trial DNA evidence with regard to the blood found in the carpet of the vehicle allegedly used to transport the victim's body was presented.  The issue was whether the blood came from  the victim or a defense witness, Lane Barnett.  Based upon DNA testing results, the prosecution argued that it was likely that the blood came from the victim.  The defense contended that the blood came from Mr. Barnett, who testified that he had

cut himself and bled inside the vehicle. The defense also presented evidence that the subject vehicle was being repaired at the time of the murder, and that the carpet in the vehicle had been installed after the date of the murder.

The initial DNA tests of the blood excluded eighty-two percent of the African-American population, but both the victim and Mr. Barnett fell within the eighteen percent of the population who could not be excluded. The prosecution offered more precise DNA test results that excluded ninety-six percent of the African-American population. The victim remained in the 4% of the population that could not be excluded. Because Mr. Barnett's blood was not tested by the prosecution, there was no evidence as to whether he fell within the 4% group, as well.

The post-conviction DNA evidence was even more precise; it excluded the victim as a source of the blood in the carpet. Thus, at trial, the evidence did not conclusively resolve whether the blood in the carpet belonged to the victim or Mr. Booker or someone else. However, the post-conviction DNA testing excluded the victim, leading to a reasonable inference that the victim was not transported in the vehicle.

The Petitioner claims that he was entitled to a new trial based upon the new DNA evidence and therefore his constitutional rights were denied. Respondents argue that Petitioner's first and third claims should be dismissed because "[t]he existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." *Townsend v. Sain*, 372 U.S. 293, 317 (1963) (overruled on other grounds). The Court agrees with the Respondents for several reasons.

First, the Petitioner has not identified any constitutional violation with respect to the DNA evidence presented at his trial.

Second, Petitioner's only constitutional challenge with regard to the DNA evidence is in the context of the denial of his request for a new trial. His contention is that the post-conviction DNA establishes his actual innocence and that the failure to grant him a new trial was a "fundamentally unfair" and a "denial of due process".

Generally, claims of innocence based on newly discovered evidence do not constitute grounds for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding. *Herrera v. Collins*, 506 U.S. 390, 400 (1993). "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – not to correct errors of fact." *Id*. Thus, the issue of whether a new trial should be granted is a matter of state law rather than federal law. *See Herrera*, 506 U.S. at 408 ("[t]he Constitution itself, of course, makes no mention of new trials"). Matters of state law may not be reviewed in a federal habeas corpus action. *see Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States"). Therefore, in the absence of an alleged violation of Petitioner's constitutional rights with respect to his trial, the first and third claims for relief should be dismissed.

Finally, in affirming the denial of a new trial, the Colorado Court of Appeals identified seven reasons why the more accurate post conviction DNA testing of the blood in the vehicle would not have had any appreciable effect on the outcome of the trial. (These reasons are set out verbatim, below, in conjunction with Petitioner's Second Claim.) The Court finds these reasons

supported by the record and concludes that to the extent that there was a constitutional error associated with the DNA evidence, it was harmless because it did not have a "substantial and injurious effect" on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

## B.  Claim Two

Petitioner's second claim is that his representation was ineffective because his counsel failed to conduct a reasonable pretrial investigation comparing the blood stain evidence with the blood sample obtained from Mr. Barnett. Actually, as the state court record demonstrates, and the Colorado Court of Appeals found, the defense presented DNA evidence comparing Mr. Barnett's blood to the blood stain on the carpet. It simply wasn't as refined a test as that presented by the prosecution.

Thus, the Court assumes that Petitioner is contending that his counsel should have submitted Mr. Barnett's blood sample for additional, unspecified DNA testing using the parameters used by the prosecution. In his Reply, he argues that

> [i]n this case, Counsel had a duty to test [Petitioner's] (Factual) theory that the State's blood-stain evidence was in fact false by having the State's evidence genetically tested and compared to the blood of Lane Barnett[,] Jr.; Also, Counsel had a duty to have the blood-stained carpet genetically tested and compared to the mattress cover that the victim's body was found in to establish whether or not the two items were ever in contact with each other. If either of these tests were to have been performed, it could/would have been conclusively proven prior to trial that the blood-stain evidence relied upon by the prosecution and the jury was in fact, False.

(#29-1 at 2-3.)

It was clearly established when Petitioner was convicted that he had a right to effective assistance by counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). To establish that

counsel was ineffective, Petitioner must demonstrate both that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance resulted in prejudice to his defense. *See id*. at 687. If Petitioner fails to satisfy either prong of the *Strickland* test, the ineffective assistance of counsel claim must be dismissed. *See Strickland*, 466 U.S. at 697.

"Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. There is "a strong presumption" that counsel's performance falls within the range of "reasonable professional assistance." *Id*. It is Petitioner's burden to overcome this presumption by showing that the alleged errors were not sound strategy under the circumstances. *See id*. "For counsel's performance to be constitutionally ineffective, it must have been completely unreasonable, not merely wrong." *Boyd v. Ward*, 179 F.3d 904, 914 (10th Cir. 1999). And under the prejudice prong, Petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In determining whether Petitioner has established prejudice, the Court must look at the totality of the evidence presented at trial and not just the evidence that is helpful to Petitioner. *See Boyd*, 179 F.3d at 914.

The Colorado Court of Appeals applied the *Strickland* standards and determined that the various ineffective assistance of counsel claims Petitioner raised in the state court proceedings lacked merit because he failed to establish he was prejudiced by counsel's alleged ineffectiveness. The Colorado Court of Appeals specifically determined "that the exclusion of all evidence, and the inferences flowing from that evidence, that the victim's blood stained the

carpet in the truck would not probably create a reasonable doubt about [Petitioner's] guilt." (#13-3 at 16.) As a result, "defense counsel's alleged failures as to the blood stain evidence did not prejudice [Petitioner] because there is not a reasonable probability that without these errors the trial's outcome would have changed." (*Id*.)

In reaching this conclusion, the Colorado Court of Appeals relied on the seven reasons that also supported denial of Petitioner's motion for a new trial.

> First, the evidence established that [Petitioner] and the victim knew each other well and lived "very close" to each other.
>
> Second, they had a relationship pertinent to the case: [Petitioner] regularly purchased drugs from the victim. Indeed, [Petitioner] admitted that he purchased drugs from the victim during the time frame in which the murder occurred.
>
> Third, [Petitioner] had a motive to kill the victim. The victim's girlfriend testified that there was animosity between [Petitioner] and the victim because of problems arising out of their drug transactions. According to [Petitioner's] wife, [Petitioner] and his brother became upset when the victim sold them diluted crack cocaine. Because of the victim's sale of these diluted drugs, [Petitioner] and his brother agreed that the victim had to "die today."
>
> Fourth, while living in Portland after the murder, [Petitioner] admitted to his wife that he had murdered the victim. [Petitioner's] wife testified that [Petitioner] provided explicit details about the killing, including how his brother held the victim while [Petitioner] stabbed the victim; how the victim struggled, causing [Petitioner] to cut himself on the wrist; how this cut enraged [Petitioner] and led him to stab the victim "over and over"; and how they disposed of the body.
>
> [Petitioner] argues that, because details of the victim's murder were published in Denver newspapers, his wife could have learned about those details from sources other than his confession, and then falsely accused [Petitioner] of the murder. [Petitioner] explored this theme at trial in cross-examination. But, as he concedes, there is no evidence in the record to suggest that any

15

>   details of the victim's murder were published in the Portland newspapers where his wife lived, or that his wife obtained a Denver newspaper to read about the murder. This absence of evidence creates the reasonable inference that [Petitioner], not a Denver newspaper, was the source of his wife's information about the murder.
>
>   Fifth, while living in Portland, [Petitioner] also made admissions to three men about the killing. He told the first man that he had stabbed a drug dealer in Denver, and then later asked the first man to keep that information confidential. The second man testified that [Petitioner] informed him that [Petitioner] had murdered someone. The third man testified that [Petitioner] talked with him about the cut on [Petitioner's] wrist. [Petitioner] said that he had to kill the man who was responsible for giving him that cut.
>
>   Sixth, physical evidence corroborates this testimony. On the same day that the police found the victim's body, shortly after the victim was slain, [Petitioner] sought treatment at Denver General Hospital for the cut on his wrist. This cut was consistent with the type of wound one might receive from a knife. The victim was stabbed over forty times.
>
>   Seventh, the prosecution's closing arguments focused on the testimony from [Petitioner's] wife, the three men, and the cut on [Petitioner's] wrist. The prosecutors mentioned the results of the tests on the carpet, but that evidence was used to corroborate [Petitioner's] various admissions; it did not serve as the centerpiece of the prosecution's case. Indeed, reference to these test results took up only about 6% of the prosecutors' closing arguments.
>
>   Although [Petitioner] impeached the prosecution's witnesses and provided evidence of an alternative suspect, we view the evidence about the blood stain as corroborative of, but not crucial to, [Petitioner's] guilt. Therefore, we concur with the trial court's conclusion that the absence of the evidence about the blood stain probably would not have created a reasonable doubt about [Petitioner's] guilt.

(#13-3 at 11-14.)

Based on the Court's consideration of the totality of evidence presented at Petitioner's

16

trial, the Court cannot find that the Colorado Court of Appeals' conclusion that Petitioner failed to demonstrate prejudice under *Strickland* is an unreasonable application of clearly established federal law.  It bears repeating that,

> [a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 131 S. Ct. 786-87.

Petitioner's contention that he was prejudiced by counsel's alleged ineffectiveness is premised on his argument that the blood-stain evidence was critical to the prosecution's theory of the case, part of which involved Petitioner and his brother using the brother's vehicle to transport the victim to the location where he was found.

> [W]ithout these tests and their results, the prosecution's use of the physical evidence was inherently Prejudicial to [Petitioner]; because, without the blood-evidence, the prosecution had no alleged physical evidence upon which to base their "Theory" of the crime; that theory being that [Petitioner] committed the murder in one place, and then transported the body to another place, wrapped in the mattress cover, laid on the carpet in the utility van, which they convinced the jury was the transport vehicle.

(#29-1 at 3.)

Petitioner also argues that the absence of the blood-stain evidence eviscerates the credibility of the testimony from his wife about his confession.  "Considering the fact that the prosecutor conceeds [sic] that their whole case was based upon [Petitioner's] ex-wife's statements, proving that the bloodstain evidence was 'Wrong/False' would have crippled their case, not to mention it would have destroyed their key witnesses [sic] credibility."  (#30 at 13.) He further argues as follows:

> Again, it is prayed that this Court will give full consideration to the prosecutor's own concerns regarding the strength of their case without the statements of [Petitioner's] ex-wife, who is the only person testifying that the bloody corpse of the victim was **supposedly placed on the carpet**; which was **supposedly in the van**; which was **supposedly used to transport the body** from the crime scene to the dump-site where it was discovered.
>
> The "Domino Effect" which the District Court eludes [sic] to in it's [sic] ruling of September 25th 2006 is obvious, and should be compelling to this Court. Without the (False) blood stain evidence, there's no way for the prosecution to prove all of the "Elements" of the crime; especially their "transport theory"; which in turn creates doubt about how the body ended up at the dump-site; which, according to the State's chief witness was transported in the van; on the carpet; from [Petitioner's] mother's apartment where the murder allegedly took place.

(#30 at 22-23 (citation to record omitted).)

The Court is not persuaded by Petitioner's logic. The seven reasons articulated by the Colorado Court of Appeals are supported by the record. They describe a vast amount of evidence to support the verdict reached by the jury even in the absence of DNA evidence tying the victim to Petitioner's brother's vehicle. The method of transportation of the victim's body was only one of many details upon which the prosecution based its case. It was not an element of the crime that the prosecution was required to prove beyond a reasonable doubt. It was not unreasonable for the Colorado Court of Appeals to conclude that Petitioner failed to demonstrate he was prejudiced with regard to the blood-stain evidence.

The Court cannot find that "most reasonable jurists exercising their independent judgment would conclude the state court misapplied" the prejudice prong of an ineffective assistance of counsel claim under *Strickland*. *Maynard*, 468 F.3d at 671. Therefore, the Court finds that Petitioner is not entitled to relief on his claim that counsel was ineffective.

For the reasons discussed above, it is **ORDERED** that Petitioner Larry Allen Thompson's Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (#2) is **DENIED**. It is **FURTHER ORDERED** that no certificate of appealability will issue because Petitioner has not made a substantial showing of the denial of a constitutional right. The Clerk of the Court shall close this case.

Dated this 27th day of June, 2011

**BY THE COURT:**

_____

Marcia S. Krieger
United States District Judge